**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMERICAN ALTERNATIVE INSURANCE CORPORATION, ) ) ) | |
| Plaintiff, ) | |
| ) | No. 14 C 01235 |
| v. ) | |
| ) | Judge John J. Tharp, Jr. |
| METRO PARAMEDIC SERVICES, INC., ) SHANNON VOLLING, JULIE BANSER, and ) APRIL SOULAK, ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

In this insurance coverage dispute, the plaintiff, American Alternative Insurance

Corporation ("AAIC") claims it owes no duty to defend or indemnify defendant Metro

Paramedic Services, Inc. ("Metro") in connection with a now-settled lawsuit against Metro and

Antioch Rescue Squad ("ARS") for sexual harassment and related torts. Metro argues that AAIC

is bound to cover Metro and is in breach of contract for failing to do so. AAIC and Metro each

move for judgment on the pleadings regarding AAIC's duty to defend, and for the reasons

explained below, AAIC's motion is denied and Metro's cross-motion is granted.

## FACTS

In the underlying lawsuit, plaintiffs Volling, Banser, and Soulak (the "claimants") sued

Metro and ARS for sexual harassment and discrimination, negligent supervision and retention,

assault and battery, and retaliation they experienced while serving on the Antioch Rescue Squad

as joint employees of ARS and Metro. ARS had an insurance policy with AAIC that covered its

defense costs in the *Volling* suit, but AAIC refused to defend Metro, denying that Metro was

covered by ARS's insurance policy with AAIC. Metro's arguments for coverage depend on it being either an "insured" or "additional insured" under the AAIC policy.

## The Policy

The applicable liability insurance policy became effective December 31, 2007, for one year and was renewed for each of the next three years. *See* Compl. Ex. A-D, Dkt. ## 1-1—1-4. As relevant to this dispute, the policy consists of a Management Liability (ML) Coverage Form and a General Liability (GL) Coverage Form. There is also a Commercial Umbrella Liability Insurance policy that extends excess coverage, *see* Compl. Ex. F—I, Dkt. ## 1-5—1-8, but the parties agree that claims for excess coverage are subject to the same terms, conditions, definitions, and exclusions as the primary policy. Therefore, references in this opinion are to "the policy." Only the provisions relevant to the coverage arguments in this case are excerpted below.

### A. What is Covered

The ML Coverage Form provides coverage for monetary damages incurred by the insured "arising out of an 'employment practices' offense . . . or other 'wrongful act' to which this insurance applies." ML Liability Coverage Form, Section I-A-1, Dkt. # 1-2 at 35.

Section VII of the ML Liability Coverage Form contains the following definitions:

> "Employment practices" means an actual or alleged improper employment related practice, policy, act or omission involving an actual, prospective, or former volunteer or employee, including . . . (g) Failure to adopt adequate workplace or employment-related policies and procedures; (h) Harassment, including 'sexual harassment.'
>
> * * * * *
>
> "Wrongful act" means any actual or alleged error, act, omission, misstatement, misleading statement, neglect or breaches or duty committed by you or on behalf of you in the performance of your operations, including misfeasance, malfeasance, or nonfeasance in the discharge of duties, individually or collectively that results directly but unexpectedly and unintentionally in damages to others.

2

*Id*. at Section VII-2, 7, 16, Dkt. # 1-2 at 46-47.

The GL Liability Coverage Form provides coverage for damages because of "bodily injury" that is caused by an "occurrence." An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." GL Liabiliy Coverage Form at Section V.16, Dkt. # 1-2 at 29. "Bodily injury" is defined as "bodily injury, sickness, or disease sustained by a person, including death resulting from any of these at any time."

**B.      Who is Covered**

Section III.2.d of the ML Coverage Form is a Blanket Additional Insured provision extending coverage to "[a]ny person or organization liable for [ARS's] "'employment practices' offenses, offenses arising out of the 'administration' of [ARS's] 'employee benefit plans,' or other 'wrongful acts committed or alleged to have been committed by [ARS]."

Section II.2.f of the GL coverage form contains a Blanket Additional Insured provision with respect to its coverage for "bodily injury" and "property damage"; an additional insured is defined there as "any person or organization required to be an additional insured under an 'insured contract' if agreed to by [ARS] prior to the 'bodily injury' [or] 'property damage'…but only with respect to liability arising from [ARS's] premises or operations."

The ML Coverage Form, at Section III.I.b, also defines an insured to include the members and partners in "a partnership or joint venture" with ARS.  The GL Coverage Form does the same at Section II.1.b.  The policy does not define "partnership" or "joint venture."

**C.      Limitations and Exclusions**

Both the GL Coverage Form and the ML Coverage Form exclude coverage for "sexual abuse." "Sexual Abuse" is defined as: "any actual, attempted, or alleged sexual conduct by a

person, or by persons acting in concert, which causes injury. 'Sexual abuse' includes sexual molestation, sexual assault, sexual exploitation, or sexual injury, but does not include 'sexual harassment.'" In turn, the policy defines "sexual harassment" as:

> "any actual, attempted, or alleged unwelcome sexual advances, requests for sexual favors, or other conduct of a sexual nature by a person, or persons acting in concert, which causes injury," including "(a) the above conduct when submission to or rejection of such conduct is made either explicitly or implicitly a condition of a person's employment, or a basis for employment decisions affecting a person; or (b) the above conduct when such conduct has the purpose or effect of unreasonably interfering with a person's work performance or creating an intimidating, hostile or offensive work environment."

GL Policy, Section V-22, V-23, Dkt. # 1-2 at 31.

Coverage for "wrongful acts" under the ML Form, by definition, is limited to acts that "result directly but unexpectedly and unintentionally in damages to others," thereby excluding acts as to which the damage was expected or intentional.

## Procedural History

The underlying litigation commenced on July 21, 2011. The third amended complaint was filed on January 24, 2013. On December 6, 2013, Metro tendered its defense to AAIC for the *Volling* lawsuit. AAIC refused to accept the tender, denying coverage and refusing to defend or indemnify Metro. Metro litigated the underlying case to a settlement agreement with claimants Volling and Soulak and stipulated to a dismissal with prejudice of claimant Banser's claims against it. In the process, Metro incurred legal fees and expenses.

As the Court has previously summarized the claims in the underlying case, Sharon Volling, Julie Banser, and April Soulak (the "claimants"), while members of the Antioch Rescue Squad, a private, non-profit provider of emergency medical and ambulance services in the Village of Antioch, Illinois, were subjected to sexual harassment (including offensive, even

potentially criminal, physical contact), a hostile work environment, sex discrimination, and retaliation at the hands of co-workers and supervisors. Assault and battery claims were added to the list in the Third Amended Complaint, by which time the Court had ruled that the plaintiffs could not proceed with constitutional claims against the named defendants.

The detailed Third Amended Complaint[1] ("complaint" or "TAC") in *Volling* contains 55 paragraphs of factual allegations (¶¶ 16-71) that are incorporated into every Count, although the counts themselves are plaintiff- and defendant- specific. Also incorporated into every count of the complaint are the allegations that "Defendant ARS jointly operates and staffs the Antioch Rescue Squad with Defendant Metro Paramedic Services, Inc." (¶ 9), and that "[a]t all relevant times hereto, Defendant Metro acted as an agent of Defendant ARS and jointly operated the Antioch Rescue Squad by, among other actions, staffing ARS with paid emergency service technicians and personnel for day shifts, assisting with volunteer services provided on nights and weekend shifts, and providing certain human resources functions for ARS" (¶ 11).

The TAC does not differentiate between Metro and ARS as the employers of the individuals alleged to have committed the acts of assault, battery, and harassment against the plaintiffs. For instance, two of the individuals responsible for many of the alleged acts, Kyle Shouse and Chris McBrady, are alleged to be employed by "Defendants." *See* TAC ¶ 20. Likewise, both "Defendants" are alleged to be responsible for the acts of the members of the ARS board of directors, which includes Chief Wayne Sobczak, Deputy Chief Brian DeKind, President Stephen Smouse, and Treasurer John Edgell. *See id.* ¶¶ 22-23.

The TAC alleges, among other things, that Shouse and McBrady made offensive sexual contact with the plaintiffs including groping, kissing, and publicly undressing them, in addition

---

[1] Case No. 11 C 4920, Dkt. # 80 (N.D. Ill. Jan 24, 2013).

to making unwelcome sexual comments and comments about the plaintiffs' bodies. *See* TAC ¶¶ 26-27. The Complaint alleges that Edgell and Smouse also engaged in inappropriate conduct with respect to female paramedics other than the plaintiffs. According to the complaint, plaintiffs' complaints about this misconduct, as well as multiple instances of batteries on and other mistreatment of patients in ambulances and working while intoxicated, went uninvestigated and unremedied. Indeed, the plaintiffs allege that they were retaliated against for pursuing their complaints.

After multiple rounds of pleadings and motions to dismiss, the *Volling* case was resolved through offers of judgment and settlement. Metro incurred substantial costs and fees in defending and settling the claims against it. Having denied Metro's tender, AAIC brought the current action for a declaration that it has no duty to defend Metro with respect the *Volling* case. Metro filed a counterclaim asserting four counts of breach of contract for AAIC's failure to defend or indemnify Metro. The counterclaim attaches, and therefore makes part of the pleadings, the contract for services between Metro and ARS. That contract states, among other things, that Metro's provision of personnel and equipment to ARS does not make it an agent or employee of ARS or a joint venture with ARS. Counterclaim Ex. 1 at Article 11 (Dkt. # 21-1 at 5); Ex. 2 at Article 11 (Dkt. # 21-2). Each party has now moved for judgment on the pleadings as to the duty to defend; Metro does not request judgment as to the two counts of its counterclaim alleging breach of the duty to indemnify.

## DISCUSSION

Federal Rule of Civil Procedure 12(c) permits a judgment based on the pleadings, which include the complaint, the answer, and any written instruments attached as exhibits. *N. Ind. Gun & Outdoor Shows Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir 1998); *see* Fed. R. Civ.

P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012). Here, there are no disputed facts raised by the parties' cross-motions; there is simply the legal dispute over the interpretation of the applicable insurance policies as applied to the allegations in the underlying *Volling* complaint.

The parties agree that this question is governed by Illinois law, under which the Court must compare the allegations in the underlying complaint with the express language in the insurance policies to determine whether the insurer's duty to defend has been triggered. *See Northfield Ins. Co.*, 701 F.3d at 1129; *Pekin Ins. Co. v. Wilson*, 930 N.E. 2d 1011, 1016-1017 (Ill. 2010); *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 75 (Ill. 1997). "If the facts alleged in the underlying complaint fall within, or potentially within, the policy's coverage, the insurer's duty to defend arises." *Wilson*, 930 N.E. 2d at 1017. An insurer may justifiably refuse to defend the insured only if it is clear from the face of the underlying complaint that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage. *Northfield Ins. Co.*, 701 F.33d at 1129 (quotation marks and citations omitted).

"Like any contract under Illinois law, an insurance policy is construed according to the plain and ordinary meaning of its unambiguous terms." *Schuchman v. State Auto Property & Casualty Ins. Co.*, 733 F.3d 231, 235 (7th Cir. 2013) (quotation marks and citation omitted). *See also, e.g., Koloms*, 687 N.E.2d at 75. But if the terms of the policy are susceptible to more than one meaning, despite application of the standard tools of textual interpretation, they are considered ambiguous and will be construed strictly against the insurer who drafted the policy. *Schuchman*, 733 F.3d at 238; *Koloms*, 687 N.E.2d at 75. Furthermore, "[a] court must construe

the policy as a whole and take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Id.*

As the proponent of coverage, Metro invokes several provisions of the policies that it contends required AAIC to defend it in the *Volling* lawsuit. First, it argues that it is a "blanket additional insured" under the ML Coverage Form because Metro was alleged to be liable for ARS's wrongful acts and employment offenses. Second, it argues that it is an "insured" under both the ML and GL Coverage Forms because it was alleged to be in a partnership or joint venture with ARS. Third, Metro contends that the underlying complaint alleges events that constitute employment practices offenses, bodily injuries, and wrongful acts so as to trigger coverage, whether it is an insured or an additional insured. ARS contends, in turn, that Metro is not covered under any applicable policy as an insured or additional insured. It further argues that coverage is not triggered by any "wrongful acts" because the underlying complaint alleges intentional conduct, and furthermore, that the policy exclusions for "sexual abuse" apply.

### A. Is Metro an "Additional Insured" under the Policy?

As set forth above, Metro argues that it is an "additional insured" because it falls under the blanket definition of "any person or organization liable for [ARS's] 'employment practices' offenses . . . or other 'wrongful acts' committed or alleged to have been committed by [ARS]."[2] Metro maintains that the *Volling* complaint seeks to hold it liable for the employment practices offenses and wrongful acts of ARS because it "contains allegations of wrongdoing solely on the

---

[2] Metro does not separately argue that it is also an "additional insured" with respect to the "bodily injury" and "property damage" coverage provided by the GL Liability Coverage Form. Metro expressly disclaims any intention to rely upon that provision. *See* Mem., Dkt. # 30 at 14 ("Metro is not claiming that it is entitled to coverage under the General Liability Coverage Form because ARS was required to name it as an additional insured.") Metro rests its argument for GL coverage on its status as an "insured" under the "partnership or joint venture" definition. *See infra* at 12-14.

part of ARS, including ARS's refusal to investigate the Claimants' reports of harassment and other misconduct"; because the Complaint suggests "an attempt by ARS to conceal the complaints from Metro"; and because "many of the allegations of wrongdoing are centered on the acts or omissions of ARS's Chief and Deputy Chief." Mem., Dkt. # 28 at 9; Mem., Dkt. # 30 at 5-6. Metro argues that because all the factual allegations of the complaint are incorporated into the counts applicable to Metro, then it logically follows that the claimants sought to hold Metro liable for the acts of ARS.

Metro's argument fails because, as AAIC contends, it is not consistent with the *Volling* complaint, which does not seek to hold Metro derivatively liable for the acts of ARS. Irrespective of the blanket incorporation of all the factual allegations into all counts of the complaint, the claimants did not any facts consistent with a theory of vicarious liability or derivative liability on Metro's part. Metro certainly does not point to a single factual allegation in the underlying complaint that could support this kind of liability rather than direct liability for Metro for its employment of and failure to train and supervise the offenders. Nothing in the complaint suggests that Metro's liability was contingent on ARS's liability, but that is clearly what the policy would require under the definition of "blanket additional insured." It applies only when there is primary liability for ARS for which another person or organization is liable.

The relevant allegations of the complaint are that Metro itself—albeit it jointly with ARS—employed and was otherwise responsible for the conduct of the wrongdoers. *See, e.g., Volling* TAC ¶¶ 9, 11, 20-23. It might be that, in reality, Metro was neither, or that the claimants would have been on sounder legal footing had they alleged vicarious or derivative liability. But that is irrelevant to the duty to defend. "[B]ecause the duty to defend is gauged by the allegations of the complaint, what the facts subsequently show is immaterial." *In re Country Mutual Ins.*

*Co.*, 889 N.E.2d 209, 210 (Ill. 2007). AAIC was not required to read into the *Volling* complaint potential theories of liability that were not supported by (and, indeed, would be inconsistent with—*see infra* at 12-13) the existing factual allegations. The alleged conduct in "the actual complaint, not some hypothetical version" determines whether the insurer has a duty to defend. *Pekin Ins. Co. v. Precision Dose, Inc.* 2012 IL App. (2d) 110195 ¶ 60, 968 N.E.2d 664, 690 (Ill. App. Ct. 2012).

Metro's motions to dismiss in *Volling* are instructive. In that case, Metro never raised arguments for dismissal that were consistent with its current position that its liability depended upon ARS's; for example, it might have attacked the absence of any factual allegations supplying a basis for vicarious liability as between ARS and Metro, but it did not—most likely because, like the Court, Metro recognized that the plaintiffs sought to hold the two defendants directly liable as co-employers. *See, e.g.*, Mem. Op., Dkt. # 72 at 11-12 ("[T]he Court has no way to separately analyze the two putative employers. Plaintiffs assert in their complaint and emphasize in their response to the motions to dismiss that ARS and Metro are 'joint operators and joint employers.'").[3] That view is implicit in Metro's arguments (contrary to the allegations in the complaint) that it was not the "employer" of claimants Banser and Soulak (*see, e.g.*, Mem., Dkt. # 37 at 9-10 in 11 C 04920); Metro was addressing claims brought against it directly, not arguing that there was no basis alleged upon which it could be derivatively liable for ARS's actions. Similarly, in arguing for dismissal of the section 1983 claims (*id*. at 4-8), Metro contended that it was not a state actor; had it believed the complaint only sought to hold it derivatively liable, it would have argued that *ARS* was not a state actor or—again—that ARS's actions could not be imputed to Metro under the facts alleged.

---

[3] In referring to the motions to dismiss, the Court recognizes that Metro (like the Court) was bound to take the complaint's allegations of joint operation as true.

In short, any fair reading of the *Volling* complaint requires the conclusion that Metro was sued—properly or improperly—for its *own* misconduct, not on any theory of derivative liability for the misconduct of ARS. Therefore, Metro cannot invoke the Blanket Additional Insured provision of the ML Liability Coverage Form that provides coverage for those who are "liable for [ARS's] 'employment practices' offenses . . ., or other 'wrongful acts.'" [4]

Metro's reliance on *Pekin Ins. Co. v. Hallmark Homes, LLC*, 392 Ill. App. 3d 589, 912 N.E. 2d 250 (Ill. App. Ct. 2009) and *Am. Alternative Ins. Co. v. Lisle-Woodridge Fire Protection District et al.*, 2014 WL 2601675 (Ill. App. Ct. June 9, 2014) does not compel a different conclusion. In *Hallmark Homes*, the court held that an insurer had a duty to defend a contractor that was potentially vicariously liable for the insured's acts or omissions. The relevant policy defined an "insured" to include "any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy," with the qualification that "[s]uch person or organization is an additional insured only with respect to liability incurred solely as a result of some act or omission of the named insured and not for its own independent negligence or statutory violation." 392 Ill. App. 3d at 591, 912 N.E.

_____

[4] The two Metro-ARS agreements contain the following indemnification provision: "It is expressly understood and agreed that each party shall in all events defend, indemnify, save, and hold harmless the other, their agents, offices, volunteers, and employees from any and all claim, liabilities, obligations, debts, charges, settlements or judgments (including attorney's fees) arising from injuries or property damage, including any and all employment related causes of action attributable to the acts or failure to act of the offending party, its agents, officers, and employees while engaged in the performance of duties under this contract." Def. Ex. 1 Article 15, Dkt. # 21-1; Def. Ex. 2, Article 13, Dkt. # 21-2. Each party must indemnify the other when it is "the offending party"; there is nothing in the plain language of the contract requiring either party to pay for the *other* party's liability. Furthermore, a provision that indemnifies a party against its own negligence is generally disfavored under Illinois law, and such provisions will be strictly construed against the party seeking indemnity; clear and explicit contractual language is required to accomplish the result. *See McNiff v. Millard Maintenance Service Co.*, 303 Ill. App. 3d 1074, 1077 715 N.E.2d 247, 249 (Ill. App. Ct. 1999).

2d at 252. The underlying complaint sought to hold general contractor Hallmark Holmes, among other defendants, liable on theories of construction negligence and premises liability. The insurer argued that because Hallmark Homes' own negligence made it liable to the underlying plaintiff, any possible liability could not be based solely on the negligence of codefendant MC Builders. The court rejected that argument, concluding instead that the underlying complaint "asserts both direct and vicarious liability," and further explaining: "Hallmark Homes is potentially vicariously liable solely on the basis of the acts or omissions of MC Builders. Inasmuch as Hallmark Homes was the general contractor on the project, with responsibility for overall supervision of the site, under section 414 of the Restatement it is possible that Hallmark Homes could be vicariously liable for the negligence of MC Builders. This could result if, for instance, MC Builders caused or knew of the dangerous condition that caused Bremer's injury, as alleged in the premises-liability claim against MC Builders, but Hallmark Homes had no knowledge of the condition. As at least one of the theories of negligence alleged against Hallmark Homes could rest solely on the acts or omissions of the named insured, Pekin has a duty to defend Hallmark Homes against all of the claims raised against it by Bremer." *Hallmark Homes*, 392 Ill. App. 3d at 595, 912 N.E.2d at 255.

This case is different. The underlying complaint does not allege both vicarious and direct liability. In fact, the allegations in the complaint are actually inconsistent with a theory of derivative liability; the claims all are premised on the allegation that "[w]hile jointly operating the Antioch Rescue Squad, Defendant Metro takes no measures to separately identify itself, but rather, acts as an agent and joint operator *in a single identity with ARS*. [TAC ¶¶21, 24, 25]." Plt's Mem. In Opposition to Mot. to Dismiss, No. 11 C 4920, Dkt. # 41 at 2 (emphasis added). Only amending the complaint to plead contrary facts supporting separate organizational

identities could make Metro even potentially liable under such a theory, and that plainly was not the view the plaintiffs took of the relationship between ARS and Metro. The *Volling* claimants made a clear choice to assert that, in effect, there are no employees of either ARS or Metro, but only employees of a jointly operated entity, the Rescue Squad, for which ARS and Metro share full—direct—supervisory authority. Particularly illustrative of this point are the claimants' allegations in Count XIII, which alleges negligent supervision by Metro. There, the claimants unambiguously target Metro as the employer of wrongdoers Shouse and McBrady; there is no hint (there or elsewhere) that those individuals are employees of ARS for whom Metro is vicariously responsible. *See* TAC ¶¶ 161-168; *see also* pp. 5, 9-10, *supra*. The allegation that the wrongdoers were the employees of Metro is inconsistent with the type of derivative liability contemplated by the blanket additional insured provisions. In *Hallmark Homes*, the same set of facts could support liability for the additional insured under either a direct or vicarious liability theory; here, however, the facts alleged in *Volling* are actually inconsistent with vicarious liability, and therefore the blanket additional insured provision is not triggered.

The same can be said of *Am. Alternative Ins. Co. v. Lisle-Woodridge Fire Protection District et al*., 2014 WL 2601675 (Ill. App. Ct. June 9, 2014), where the court held in part that defendant Chicago Metropolitan Fire Protection Company was potentially covered as an additional insured (under AAIC policy language identical to the provision at issue here) based on its potential vicarious liability for the acts of the Fire Protection District. The court reasoned that Chicago Metro, which was alleged to be part of a conspiracy with the District, could be vicariously liable to the extent that the District adopted certain ordinances that allegedly restricted competition in the area of fire alarm services for the benefit of Chicago Metro. But in any alleged conspiracy, each member is liable for the other members' acts that are foreseeable

and in furtherance of the shared goal. The very nature of the underlying claim made it possible for Chicago Metro to be held to account for another actor, assuming the conspiracy were established. That situation is not comparable to the allegations in the *Volling* case, where Metro's *own* acts and omissions as the employer of the wrongdoers were the only alleged basis of liability.

Metro's contention that the decision in *Lisle-Woodridge* has preclusive effect in this case, barring AAIC's argument that Metro faces direct, not vicarious, liability under the *Volling* complaint fails for the same reason. Mem., Dkt. # 28 at 10; Mem., Dkt. # 30 at 8-9.[5] The legal theory advanced in *Lisle-Woodridge* was based on a theory of derivative accountability that is inconsistent with the theory direct liability pleaded by the plaintiffs in this case. The doctrine of issue preclusion does not apply here because the issue decided in the prior proceeding is not identical to the one in the suit in question. *See Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill.2d 71, 77, 744 N.E.2d 845, 849 (Ill. 2001) ("Collateral estoppel may be applied when the issue decided in the prior adjudication is identical with the one presented in the current action, there was a final judgment on the merits in the prior adjudication, and the party against whom estoppel is asserted was a party to, or in privity with a party to, the prior adjudication."). It is true that the Court is confronted in this case with an identical blanket addition insured provisions, but it cannot be said the underlying complaints in the two cases are identical in view of the different liability theories pursued by the plaintiffs based upon the specific facts of the underlying complaints.

---

[5] Much of the issue preclusion argument is directed at rebutting AAIC's argument that the policy language requires the entity ostensibly being held responsible for ARS's employment practices offenses and wrongful acts to itself be only an "innocent bystander." The Court has not found it necessary to address that argument, having concluded that the *Volling* complaint simply does not allege the kind of derivative liability that the policy language refers to.

In summary, Metro is not an "additional insured" under the ML Coverage Form (covering employment practices injuries and wrongful acts) because the underlying complaint does not seek to hold it liable for ARS's misconduct. It also is not, and does not claim to be, an "additional insured" under GL Coverage Form (which covers bodily injury and property damage).

**B.      Is Metro an "Insured" as a Member of a Joint Venture with ARS?**

Metro also invokes coverage under the policy provisions in both the ML and GL Liability Coverage Forms defining an "insured" to include any partners or members in a "partnership or joint venture" with ARS. AAIC argues that the *Volling* complaint cannot be read to allege any kind of joint venture within the meaning of Illinois law, and further that Metro has pled itself out of court by attaching to its counterclaim its contracts with ARS that disclaim any joint venture. This time, Metro has the better argument.

The underlying complaint is replete with allegations that Metro jointly employed or was otherwise directly responsible for the bad actors who committed the harassment and torts alleged in the complaint. More importantly, the complaint alleges joint operation of the Rescue Squad by ARS and Metro together. *See, e.g.*, Volling TAC ¶ 9 ("Defendant ARS jointly operates and staffs the Antioch Rescue Squad with Defendant Metro"); ¶ 10 ("Defendant Metro . . . operates ambulance and paramedic services jointly with Defendant ARS"); ¶¶ 11-15.

AAIC counters that, despite the allegations of a joint operation, all of the elements required for a joint venture under Illinois common law are not present, and therefore the policy's definition of "insured" does not apply. But AAIC does not provide any authority to support its position that all the requirements under Illinois common law must be met (and the Court expresses no opinion as to whether they are) to trigger the policy. The policy itself does not

define "partnership or joint venture"; therefore, pursuant to Illinois rules of contract interpretation, the terms should be given their everyday meanings—not treated as legal terms of art. *West American Ins. Co. v. Yorkville Nat. Bank*, 238 Ill.2d 177, 184, 939 N.E.2d 288, 293 (Ill. 2010) ("Unambiguous words in the policy are to be given their plain, ordinary, and popular meaning"). For the "plain, ordinary, and popular meanings," the Illinois courts look to their dictionary definitions. *Valley Forge Ins. Co. v. Swiderski Electronics, Inc.,* 223 Ill. 2d 352, 366, 860 N.E. 2d 307, 316 (Ill. 2006). A joint venture, therefore, is simply a cooperative enterprise. *See* "joint venture," Oxford Dictionaries. Oxford University Press, www.oxforddictionaries.com/us/definition/american_english/joint-venture (accessed November 4, 2014) ("A commercial enterprise undertaken jointly by two or more parties that otherwise retain their distinct identities."); Random House Dictionary of the English Language 1033 (2d ed. 1987) (defining "joint venture" as "a business enterprise in which two or more companies enter a temporary partnership").

A fair reading of the *Volling* complaint compels the conclusion that Metro was alleged to be a joint operator of the rescue squad and a joint employer of its crew (and to the extent that there is any doubt on that score, in assessing duty to defend, such doubt must be "resolved in the insured's favor," *Employers Ins. of Wausau v. EHLCO Liq. Trust*, 186 Ill.2d 127, 153, 708 N.E.2d 1122, 1136 (Ill. 1999)). Whether these allegations are true—Metro itself surely believes otherwise—has no bearing on AAIC's duty to defend. "If the facts alleged fall within, or potentially within, the policy's coverage, the insurer is obligated to defend its insured . . . . This is true even if the allegations are groundless, false, or fraudulent, and even if only one of several theories of recovery alleged in the complaint falls within the potential coverage of the policy." *Swiderski Electronics, Inc.,* 223 Ill. 2d at 363, 860 N.E. 2d at 314-15 (Ill. 2006). The insurer

may not justifiably refuse to defend unless it is clear from the face of the underlying complaint that the allegations set forth in the complaint fail to state facts that bring the case within, or potentially within, the coverage of the policy. *Id.* On the face of the *Volling* complaint AAIC could not reasonably conclude that there was no potential for coverage in view of the allegations of the joint operation of the Rescue Squad.

As for the ARS-Metro contract, AAIC is wrong to suggest that Metro pleaded itself out of court by attaching it to its Rule 12(c) motion in this case. The ARS-Metro contracts contain a provision disclaiming any agency or joint-venture relationship between those parties. That private agreement, however, is not legally dispositive of the relationship between the parties with respect to *this* litigation or with respect to third parties generally. *See* 59A Am. Jur. 2d Partnership § 139 ("In the presence of an intent to do those things which constitute a partnership, the parties will be considered partners even though they intend to avoid the liability attaching to partners, or expressly stipulate in their agreement that they are not partners. In other words, the substance and not the name of the arrangement determines the parties' legal relation to each other."); 805 ILCS 206/202(a) ("Except as otherwise provided in subsection (b), the association of 2 or more persons to carry on as co-owners a business for profit forms a partnership, *whether or not the persons intend to form a partnership*") (emphasis added). The applicable policy does not define "joint venture" for purposes of who is an "insured," and neither does the ARS-Metro contract define the term in the context of the relationship between those parties. AAIC assumes, but provides no support for its argument, that the terms mean the same thing in both contexts. Moreover, that Metro denies that it is a joint venturer with ARS is beside the point; the question is what the plaintiffs in the underlying suit alleged. While the agreement between ARS and Metro might operate to bar claims between those parties predicated on the existence of a

partnership or joint venture, it is not determinative of the rights of either party vis-à-vis *the claimants*. The *Volling* plaintiffs alleged that ARS and Metro operated the rescue squad together, thereby exposing Metro to potential liability as a joint employer with ARS. It does not matter whether the claimants were right or wrong about that fact; their allegations suffice to make Metro an additional insured under the "partnership or joint venture" provision of the policy.

The conclusion that the underlying complaint supports a duty to defend based on theory of joint venture liability is not inconsistent with the conclusion that there is no duty based upon derivative liability under the blanket additional insured provision. The *Volling* claimants alleged that they were jointly employed by ARS and Metro; they did not allege facts about the relationship between Metro and ARS that would support a theory of relief based on Metro's liability for the conduct of individuals employed solely by ARS. The allegation that the wrongdoers were the employees of Metro (as well as ARS) is inconsistent with the type of derivative liability contemplated by the blanket additional insured provisions, but it is perfectly consistent with joint venture liability. Derivative liability and joint venture liability are not inherently mutually exclusive; however, under the facts alleged by the claimants, Metro was indistinguishable from ARS and therefore could not be anything other than directly liable.

For these reasons, Metro has established that it was potentially an "insured" under the AAIC policy for purposes of AAIC's duty to defend.

**C.      Are the Allegations Arguably Covered by the Policies?**

Having concluded that Metro was potentially an "insured," the Court must next determine whether the underlying *Volling* complaint alleges any events of liability for which the

policy provides coverage.[6] Metro suggests that the provisions providing coverage for employment practices injury, wrongful acts, and bodily injury each apply. Based on the plain language of the policy compared to the underlying complaint, the Court has little trouble concluding that there are allegations of "employment practices" injuries, "wrongful acts," and "bodily injury," as those terms are defined in the policy.

The "employment practices" injuries—covered under the ML Liability Coverage Form—alleged in the Volling complaint include the sexual harassment, discrimination, and retaliation that the claimants allegedly endured, as well as the failure to supervise and the negligent retention of the offenders. *See, e.g.*, *Volling* TAC ¶¶ 69, 70, 74, 81, 88, 95, 102, 108, 114, 120, 126, 132, 138, 144, 152, 164, 173-75, 185-87. The "wrongful acts" allegations—also covered under the ML Liability Coverage Form—include the same negligent failures to supervise and negligent retention of the wrongdoers.

Finally, the assertions pertaining to "bodily injury"—for which there is coverage under the GL Liability Coverage Form—can be found in the factual allegations that support the battery claims (Counts XVII and XVIII). These include the groping, slapping, and other offensive contact with the plaintiffs by Shouse and McBrady. *See, e.g.*, *Volling* TAC. ¶¶ 26(a)-(z), 211, 218. It is true that the complaint does not expressly allege resultant physical harm or medical care, but the request for damages for the "injury" and "pain" caused by the battery (*see* ¶¶ 71, 222), does not foreclose the possibility.

AAIC does not argue in its own motion or in response to Metro's motion that the *Volling* complaint does not allege "employment practices" injuries. Nor does it make any arguments with

_____

[6] Neither party says whether AAIC covered ARS under the policy, but to the extent that it did, it would be hard-pressed to argue that the policy is not triggered by the identical facts alleged in the *Volling* complaint as to Metro.

respect to "bodily injury." Metro clearly argued for coverage for these two forms of liability, and AAIC's failure to address either provision forfeits any argument against coverage for these types of events.

AAIC does maintain, in cursory fashion, that there are no "wrongful acts" alleged because a wrongful act must be conduct "that results directly but unexpectedly and unintentionally in damages to others." Although it does not develop the argument (*see* Mem., Dkt. # 26 at 14; Mem., Dkt. # 29 at 10), the implication appears to be that the *Volling* complaint alleges only intentional harm. This is not consistent with the complaint, particularly the allegations of negligent supervision and negligent retention.

Finally, AAIC argues that the exclusions for "sexual abuse" apply to bar any coverage for Metro. *See* Mem., Dkt. # 26 at 14; Mem., Dkt. #29 at 10. AAIC does not pinpoint any allegations of "sexual abuse," and its argument is inconsistent with its own policy language. The claimants in *Volling* do not allege "sexual abuse" as defined in the AAIC policy. Sexual abuse under the policy "includes sexual molestation, sexual assault, sexual exploitation, or sexual injury, but does not include 'sexual harassment.'" It consists of "any actual, attempted, or alleged sexual conduct by a person, or by persons acting in concert, which causes injury." There are arguably some allegations in the complaint of attempted "sexual conduct" as to the claimants, but the overwhelming weight of the relevant allegations of "sexual harassment" as separately defined by the policy and excluded from "sexual abuse." *See* pp. 3-4, *supra*. Moreover, with respect to the other alleged employment related offenses, the assaults, and the negligence, the sexual-abuse exclusion is inapplicable.

### D. Duty to Defend or Indemnify

Based on the foregoing analysis, Metro is an "insured" under the policy, and the *Volling* complaint alleges conduct within the scope of coverage. Therefore, AAIC had a duty to defend that it breached when it refused Metro's tender. This results in the denial of AAIC's motion for judgment on the pleadings, and the granting of Metro's motion as it pertains to Counts I and II of its counterclaim for breach of contract. The costs of the defense were for AAIC to bear, and Metro must be awarded damages in the amount of its defense costs, which according to the First Amended Counterclaim, exceed $500,000.

Metro has not moved for judgment as to Counts III and IV of the counterclaim, which allege breach of contract to the extent that AAIC has refused to indemnify Metro as to its settlement obligations to claimants Volling and Soulak. *See* Motion, Dkt. # 27 at 4-5. A duty to indemnify arises when the insured's liability to a third party on the underlying claim has been determined, and the insured's activity and the resulting loss or damage actually—not just potentially—comes within the policy's coverage. *See Outboard Marine Corp.,* 154 Ill. 2d at 127-28. Where the insured settles the underlying lawsuit prior to verdict, it must demonstrate that it settled "an otherwise covered loss in 'reasonable anticipation of personal liability'" to recover the settlement. *Santa's Best Craft, L.L.C. v. Zurich American Ins. Co.*, 408 Ill. App. 3d 173, 183, 941 N.E. 2d 291, 301 (Ill. App. Ct. 2010) (citations omitted). Metro's counterclaim for breach of contract premised on the failure to indemnify—Counts III and IV—therefore remains to be resolved.

\* \* \*

For the foregoing reasons, the Court grants Metro's motion for judgment on the pleadings and denies that of AAIC.

Date: December 12, 2014

_____

John J. Tharp, Jr.
United States District Judge